Good morning, Your Honors. Is that the correct way to pronounce your last name? My name is Cheryl Legree, and I represent Ms. Jeter in this matter. 0 for 2 this morning, okay. It's a really complicated one. And thank you for allowing us to be here today. In getting ready for this argument, I was reminded that the Americans with Disabilities Act was signed into law 33 years ago Wednesday. And we're here because, you know, it's interesting in listening to the prior argument, you know, the language of the statute is what it is here. And under the ADA, employers must not discriminate against qualified individuals with disabilities. To meet her case, Ms. Jeter needed to show that she was disabled. That's undisputed here. That she was a qualified individual with a disability, and that Schneider National Carriers failed to accommodate her disability or otherwise discriminate against her based on her disability. Again, nobody disputed that Ms. Jeter was disabled. But the lower court did wrongfully conclude that Ms. Jeter was not a qualified individual with a disability and could not have performed the essential functions of her job with her requested accommodation, which, for purposes of summary judgment in this argument today, was she had eight more days off before she could return to work, and she needed to be allowed to work remotely when she was scheduled alone, which — Every portion of the record? Certainly, Your Honor. So one of the arguments that you made below and here is that one of the supervisors — I think it was Mr. Turner, is that right? Travis Torrance, Your Honor. Sorry. That he had been essentially working part-time because he had missed approximately 80 days of work in a given calendar year, right? Yes, Your Honor. There's an allusion in one of the briefs to him saying that that characterization is quote-unquote not accurate. Right. What did he explain in his deposition? That's all that he said, that it wasn't accurate, or that he didn't recall it that way is essentially what it boils down to. But did he admit that he was absent for a number of days, or not at all, or? He didn't admit or deny, and interestingly enough, Mr. Torrance did submit a declaration at summary judgment. He didn't address the issue. And it's undisputed the calendars were not produced, and so it's my client and another third shift APM saying we looked at the calendar that everyone had access to, and he was gone somewhere between 80 and 82 days in 2018. Were those calendars requested? I believe that they were covered by discovery because we always ask for, you know, anything that proves or rebuts the case. Can I ask you a question? Mr. Torrance, he was a driver team lead, not an APM? He was an operations supervisor. So he was not in the same position as Ms. Jeter? He was not in the same position as Ms. Jeter, and we're not alleging that he's a comparator here. We are only alleging that it can be done and was done for him. And I think, you know, at trial, if this court reverses and remains as we're asking, at trial we could subpoena the calendars and have them at trial. They are business records. They could have been produced. They haven't been produced. But I don't think that's the only evidence, and so I'm jumping ahead a little bit. I don't think that's the only evidence that employees of Schneider were allowed to work part-time. You know, I think there's two things at issue with respect to the eight additional days Ms. Jeter needed off. First is, there's a flexible work policy at Schneider that says we allow part-time work. We allow modified schedules. We allow remote work. Nowhere in that policy does it say that area planning managers are excluded by this policy. That policy, it doesn't guarantee any approval, correct? It's a discretionary policy that needs to be evaluated and approved based on the employer's circumstances. So why does the existence of that discretionary policy create a genuine issue of fact as to whether full-time work is an essential function of the job? Your Honor, it creates a genuine issue of fact because by its very nature and the fact that it allows, even on a discretionary basis, part-time work, right? I mean, there's other cases where part-time work is just simply never allowed at an employer. You know, and you have to query under Holley v. Clareson whether even that would be an essential function of the job because you can have a neutral policy and still be required to accommodate an employee. And the ADA itself contemplates under Section 12.111.9b that part-time work can be a reasonable accommodation. And, you know, I feel like we've gotten so caught up in this case, in these issues, when we're really talking about temporary, a temporary accommodation. That's how every single case cited by the defendants is distinguished. They were all seeking permanent accommodations. Many of them had been accommodated for 13 years when they were finally terminated. There's, we didn't get to undue burden because the district judge granted summary judgment well in advance of that. Were there any other APMs that were part-time? Not permanently part-time. There's testimony in the record. My client worked part-time for, from January 2nd until April 12th when she was terminated. And there is evidence in the record, although Ms. Kitchens denies it, APM Koff said Ms. Kitchen was allowed to work part-time when she returned to work after her mother had a stroke. So there is some evidence, well. But that's the occasional sort of one-off situation for a medical situation or other discrete circumstance. Is there any record evidence that there were any APMs that, as a regular matter, worked part-time? There's no evidence in the record. But it wouldn't matter because that's not what Ms. Jeter was asking for. She was asking for temporary part-time work. And that's what Some of the, some of the confusion for me at the beginning when I read the briefs is that if you think of a, if you think in abstract terms of someone who is working full-time, I think most people would think five days a week, eight hours a day. That's not her full-time schedule. Even before she had the incident, right? It was not. That led to the accommodation request. She was working first four days a week and then three days, right? So at the time of the, help me with this, at the time of the last requested accommodation, what was her schedule? What was the schedule she was working at the time? Yes, Your Honor. She was working Wednesdays, Thursdays, and Fridays at the time of her, her accommodation through June 5th. Ten hours a day? Yes, ten hours each day. In the night shift? In the night shift, yes, overnight. And she was Why can't she work, because that was the thing, she could only work three days, not four days  Correct, Your Honor. The other APMs worked four days a week. No, many of the APMs worked five days a week, but they worked shorter shifts. Okay. Schneider was very flexible with the hours people came in. They all came in at different times and left at different times. Some worked longer shifts, some worked shorter shifts. And I think that cuts in our favor. It shows that it can be done. So she was, okay, so she was working three days a week, Wednesday, Thursday, Friday, ten hours a day, but that was based on the accommodation that had been granted earlier, right? Yes. Before the last one was denied. Yes, it was granted on January 2nd. It was not denied until she was terminated on April 12th. But it was granted once, right? It was actually granted twice, Your Honor. And her requested accommodation was to continue on the same schedule or change the days, or what? To continue on the same schedule for eight more weeks. Now, how does the employer know in a situation like this one if that request really is another temporary request, or it's just going to be a series of endless temporary requests, which will lead to a permanent accommodation? And I'm not asking about this case, but like generally, the easy case is first accommodation. Sure. You have an event, something happens, and you have a qualified individual, and you say, I need this temporary accommodation for X period of time, and it's supported by a doctor's note or whatever, and of course you think that's temporary. But as you go down the line, like at what point does an employer legitimately think this is really not temporary anymore? Your Honor, I understand the concern and the hypothetical, but the employers are obligated at that point to rely on the objective medical evidence, first of all, which said she would 95% return on June 5th. But second of all, to the extent they had any concerns, reach out to the doctor, which they did, but then they terminated her before that paperwork could be returned. And I think that's an important point because the interactive process broke down at that point because they didn't even reach out to her doctor and say, hey, can we get this back? We haven't gotten it. We need it back. And they could have gotten a release from Ms. Jeter and may have had one to speak with the doctor. If they're concerned that it was going to be permanent, ask, you know, and then rely on the objective medical evidence in that case. Why didn't they ask the doctor when the last request was made? They sent a reasonable, they sent reasonable accommodation paperwork asking for specifics about what was happening and whether she would be released on June 5th. The ultimate document that they didn't get back, it was completed and said she would come back June 5th. So had they slowed down the process just a tiny bit, engaged in the interactive process, they would have known it was likely Ms. Jeter would be back June 5th. And they did know that was the request through June 5th. I understand the concern, but the ADA requires preferential treatment be given to employees so that they can engage in an equal employment opportunity, and that's all Ms. Jeter was asking for here. She wanted to work. Thank you, Your Honors. All right. Thank you very much. You've saved your time for rebuttal. May it please the Court, Matt Fitzgerald on behalf of Schneider. Summary judgment was proper here at the first level of the ADA analysis. Ms. Jeter was not a qualified person. And I'd like to address, if I may, some of the questions about the record that have been addressed already. So... If she wasn't a qualified person, why did they give her the initial accommodations? Your Honor, they went above and beyond what the ADA requires in order to try to work with her and to keep her on as an employee. There's no argument that she was a bad employee. And the law is clear that prior accommodations don't make a future accommodation reasonable. That's Wood v. Green, it's Holbrook v. City of Alpharetta, where the employers in those cases said, okay, we can work with you, this is more than we have to do, but eventually they couldn't because the people couldn't do the essential functions, and they were not qualified. Now, there's been some discussion of Travis Torrance. So you can't... So if an employee requests part-time work for a period of time and the job requires full-time work, an employer's never required to provide that accommodation? If it is true that the qualifications for the position, that it's an essential function... The schedule's five days a week, and someone's gone through surgery for a disability, and the doctor says, listen, physically, my patient, your employee, cannot work more than four days a week for the next three weeks. Yes. Okay? She just can't do it. And so you need... She needs an accommodation for two weeks to work a four-day-a-week schedule. Is that employee qualified? I think... So the way that it actually works in practice is, this is what the FMLA is for, Your Honor. So it's actually present in this case, too. When she first suffered these mental health issues, she took her full three months of FMLA. That's also what the APM Kitchens did, took some intermittent FMLA, which covered it. So I think as a practical matter, you don't get a collision between the ADA and the needs of an employee right away in a situation like this, and we didn't in this case. So... But if the employee doesn't request FMLA leave and request an ADA accommodation, my question to you is, is that employee who requests part-time work four days a week instead of five days a week for a two-week period to recover from surgery due to a disability, is that employee a qualified employee under the ADA? No, Your Honor. They're not. And I think as a practical... So you're never required to provide... So your answer is, I think, that an employee is never required to provide part-time work as an accommodation, even though the statute says it. Oh, no, no. It depends. So you could easily imagine a position or a set of facts where part-time would be a reasonable accommodation. It's not... Tell me what that is. So let's say if the facts of this case are, instead of 10 APMs covering this through full-time shifts and all of them work full-time, we had 25 APMs and half of them were part-time. It would be quite easy then to say, like, okay, it's reasonable. You know, she can work part-time. This is not an essential function of the APM job under those circumstances. And she could work part-time then, you know, probably indefinitely. But that's just not the way that this employer and this workplace is structured. If the written job description says one thing, why isn't that enough to get the case to a jury on whether or not full-time work is a required qualification of employment? So, Your Honor, I think... This is summary judgment. It is summary judgment. And the district court is aware of the summary judgment standard, which is in its opinion at pages 16 and 17. And I think the key is, there are obviously a lot of considerations, but the ultimate question is, could a reasonable jury find Ms. Jeter qualified? The answer is probably yes, because if the jury credits your written Schneider's written work description over everything else, you get one result. If you credit the testimony of Schneider's representatives over the written job description, you reach a different result. Well, that's... It would not be reasonable on the facts of this case for a jury to credit the technical job description in that way. And the key reason for that is, what is the purpose of the job description factor? The purpose is, what did the employer write down as being key to the job upfront before this issue ever arose? And what we have here is the offer letter to Ms. Jeter, which says, this job is full-time, 40 hours, third shift. So it's even better than the job description in a way, because we know that she saw and accepted the offer letter. She testified she knew the job was full-time going in. Does the job description, it references the word exempt, salaried, which then matches up with the offer letter? It does, Your Honor, exactly. Exempt salaried is a reference to being exempt from overtime under the Fair Labor Standards Act. That typically requires that the employee be salaried and also be salaried at a high level such that very few, if any, part-time employees would be that. And the third shift is the late shift, correct? The third shift is overnight, yes, Your Honor. And on Sundays, she did work some Sundays, correct, in the beginning? Or there was some shift where she was the only person that was at the APM? Yes, Your Honor. Thursday nights and sometimes Sunday nights, she's the only APM, or the only person at all in the office, which is an important part of the analysis here, because the way Schneider is structured is it has this group, roughly 10 APMs. They staff this place 24-7. And even today, someone is staffing this office 24 hours at this Fairburn hub. And so her requested accommodation, just to circle back to this, her requested accommodation on the table when she was terminated is to continue, as she had been for three months already, working three instead of four shifts, and to work two of those shifts plus any time she was supposed to work alone at home. So really, she's only proposing even to be in the office covering her shift one day out of the week. But the working from home is not really an issue, because the evidence viewed at summary judgment and the lie most favorable to her shows that APMs were able to work remotely. Your Honor, there is no evidence of any APM ever working from home when they are the only person in the office. Working remotely? Right. There is no evidence. Didn't the company move its APMs to another state? Your Honor, a year after she was terminated, the job of APM was divided in half. And it's really important. So yes, the title of APM went to Green Bay, and it's done completely remotely now. But the actual job responsibilities were split. And there are, in fact, people still in Fairburn today, today they have a different job title, but they're staffing that place 24-7, and that is part of what the APM job was when she was doing it. So the fact that the employer split the job a year later and moved the people to Green Bay should have no impact on the analysis here. Why did Schneider not wait to get a response from the doctor when the last request for accommodation was made? Is there any explanation in the record as to why, after having sent the letter, they didn't wait for a response? So Your Honor, they sent the letter in very early April. They asked for a response within about a week. When a week after that, no response had come in, that's when she was terminated. But I think it points to the broader issue that they were having here, which is actually these restrictions created an extreme strain on the other employees at Schneider who were doing her job, doing the essential functions of her job. So Torrance, for instance, in his affidavit 46-3, says he was working some of these Sunday overnights. It was very tiring. He would cover—he was a supervisor on the second shift, then he would physically work there on the third shift. This was damaging his health, was making it harder for him to do his real, ordinary job. And so what you see is this strain on other employees justifying this. Well, now she's requesting not only to work three shifts, but in addition to put in writing and always work from home, especially when she's working alone, which means another hole that Schneider is going to have to fill. Is that better considered under undue burden as opposed to whether or not the employee is qualified? So, Your Honor, these things could be considered under any of these factors, and the factors all overlap some. But it's proper to consider them—I mean, the most straightforward way to affirm is the full time, to say that full time is an essential function. And what we have here is— I don't want to give anybody an accommodation of—if full time work—I don't want to put words in your mouth, but you tell me if I've got it right. If full time work is a requirement of the job, an employer is never, ever required to provide a part time accommodation that's temporary. It is—it is only—that is only true if the full time is an essential function of that particular job, which may not— If you tell somebody to work full time, of course, under your view of the world, of course it's an essential function of the job. If you tell somebody your work is full time, five days a week, 40 hours a week. If you tell them that, you expect them to be there five days a week, 40 hours a week. So, how can you require full time work and say that full time work is not essential? Tell me that. I don't understand that at all. So, the facts here are actually way better than that, because what we have is—so she understood as you're talking about— I'm asking about the facts here. We have to write an opinion in this case that governs not only and resolves not only this case, but resolves a case going forward. And so, I want to know how broad or how narrow the principle that you're advocating is. So, here's the—here's the abstract question, not tied to this case, okay? If full time work is an essential requirement of the job, the ADA does not require an employer ever to provide temporary work—I mean, to provide part time work as a temporary accommodation. Is that the principle? No, Your Honor. Okay, tell me what the principle is, abstractly. So, as abstractly as possible, it is possible for full time work to be an essential function of a job. It is not always the case, but it is possible for full time work to be an essential function of a job. So, for instance, this court— But in my hypothetical, it is. So, you have to take that as a given, where full time work is an essential requirement of the job, is your position that the ADA never requires an employer to allow part time work as a temporary accommodation? Yes, but I think it's— Even though the statute says that part time work is a type of accommodation provided. And it certainly can be, and it probably will be in a lot, if not most, cases. What has to be shown is that for the particular job, that full time work is an essential function. Can I ask you a question, because maybe I'm confused in the record. But I thought part of the issue was that what was really truly essential was that it was in person, because you needed to be able to give keys to the truckers that were in a lockbox. You needed to be able to print out, I guess they needed their driving log or wherever they were going. And for some reason, the printers were locked, and then it was difficult. You could technically remotely print, but you needed to have someone there to be able to give it to the truckers who came. Correct, Your Honor. So physical presence in the office is another, an independent reason why the court can affirm here. I mean, I'm only speaking for myself, but to me, that was really more the essential function of the job, being in person rather than because of the nature of what was required, rather than being a full time. Well, yes, Your Honor, and that's what the magistrate judge found and wrote about at some length. The district court never reached that, but you can affirm on that ground equally well, and that's how we've argued it in the brief, that not full time, but that physical presence in the office is an essential function of this job. The office is staffed 24-7, and to this day, it's staffed 24-7, because the way that 10 APMs and more than 100 truckers based in Atlanta operate is that they can go to this place. If their truck doesn't start, if the previous truck hasn't arrived in time for them to pick it up and take it somewhere else, that's the dispatcher's job, and the dispatcher is right there. So when they were getting the keys, they were getting keys for a truck that they were going to go out on the road in? Yes, Your Honor, and in particular, in situations where there's some problem. So they've got the key, perhaps the truck doesn't start, they need another truck. If that's being handled remotely, they've got to get on the phone, they've got to wait for someone to get through to them, they've got to figure out where the other truck is and how to get it. Again, the keys for these trucks were in a lockbox? They were in a lockbox in the office, which is where the dispatchers worked, yes, Your Honor. Is it correct on this summary judgment record that when Ms. Schneider was teleworking, I'm sorry, when Ms. Getter was teleworking, that Schneider had to assign other employees to cover her shift because of the in-person nature of the work? Yes. Is there a dispute of fact at all on that point? No. There is no disputed fact that the way Schneider organized this is whenever someone physically was not there, if they were the only person, there was always someone physically in the office. So if she was remotely working, someone else was physically there. And in fact, there are stories being told of, so one time she's working remotely and there's an issue, she has to drop everything and run in to help, it takes all of this time, it shows the need for having someone there. And that's the way that Schneider was organized and still is to this day, which supports, even Judge Jordan, your concern about full-time aside, using physical presence in the office as an essential job function in this case. Right. That's a different concern. That's a different concern. I was talking about part-time versus full-time, not remote versus being physically present. So, for me only, I'm concerned at that broader principle, and we may not need to reach it, but I'm concerned that we would hold that the ADA, that an employer is never required to provide a part-time temporary accommodation when full-time work is an essential requirement of the job, regardless of whether or not there's an undue burden on the employer. That does not make sense to me in terms of what the statute says about part-time work being one of the possible accommodations provided. I think the narrowness of the opinion that could be written there, it could be plenty narrow because you could even say the analysis is whether full-time is an essential function. We can envision hundreds and thousands of jobs where being full-time is not an essential function, but on the facts of this case, it is an essential function, and the facts of this case don't present the problem that you talk about because she took her full three months of FMLA. We then worked with her reasonably for three and a half months from January through April. She said she was coming back to work in June. She said that several times. The record actually contradicts that. At docket 46-4, page 106, her own doctor extended those restrictions into September, so Schneider understood that this was becoming permanent and properly let her go. Thank you. Thank you very much. Your Honors, I'd like to clarify a few things in the record. First, the last statement about her leave being extended, the evidence in the record says that after Ms. Jeter was terminated, she spiraled down and her leave would have needed to extend because of that. There's no evidence that would have happened if she hadn't been terminated and lost her employment while she was sick. Second of all, can the job be performed remotely? Well, it was performed remotely throughout the pandemic with no essential functions being eliminated from the job. And the APM. But I don't, I think that might, I'm not sure that relying on the, on the COVID restructuring of the job is necessarily factually appropriate. She was terminated prior to COVID, correct? She was, Your Honor. So then we would be looking in terms of the relevant time period, when did she request the accommodations and what were the facts on the ground at that point? At that point, there was no telework option for APMs, correct? No, that's not true. In the record, would that be evident? Well, the entire record. Ms. Kitchens worked remotely for four months from the hospital when her mother had a stroke. Travis Torrance. That was the record evidence there showed that that was, she wasn't working remotely continually for four months. Ms. Kitchens said she was. Ms. Biskey-Rose said she didn't remember it that way. But the record evidence said she was at the hospital in the ICU for four months and she came back full time in the office after her mother was released from the ICU and sent to a rehab facility. But didn't she just take the FMLA? She didn't take FMLA and she testified she didn't take FMLA. Ms. Kitchens did. But more importantly, they're dispatching 2,250 drivers, only 100 of which are in Atlanta. During the pandemic, and actually I wanted to address legally Judge Cannon, under the ADA when you're assessing essential functions, you do look at what is currently being done in the position. So you do consider what happened during the pandemic. They didn't restructure the job during the pandemic. They did all the same duties. They did them from home. The only thing that changed in Fairburn was the lockbox with the keys was moved to the driver lounge that the drivers had access to, and the printer was moved to the driver lounge that they had access to. And Ms. Jeter testified very clearly that in every other hub, the lockbox was in the hands of an employee at that hub. Same thing with paperwork. She either printed it from home or from the office to a printer that was in the driver lounge that the drivers had access to because there were no people in the other hubs. In Charlotte, in Miami, no people worked there. Yet they had 2,000 drivers that worked out of those hubs. Anyway, I think the bottom line is this. Even if, and I'm trying to address both the remote work and the flexible work arrangement policy. Under Holly v. Clareson, even if you have a disability-neutral policy, you may have to amend that policy for disabled employees to accommodate them. The ADA says that. Reading a full-time work requirement and an in-facility work requirement into an APM role when it's not in the job description, and Schneider explicitly has policies that permit these things. It would violate the provision of the ADA describing reasonable accommodations as including job restructuring, part-time, and modified work schedules. And I thank you for your time, Your Honors. Thank you both very much. Thank you. All right. That concludes our week of arguments. Court is adjourned. All rise.